**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

8  GEORGE J. ALVAREZ,                          No. C 12-5623 SI (pr)

9          Petitioner,                         **ORDER OF DISMISSAL**

10         v.

11 CONNIE GIPSON, Warden,

12         Respondent.
                                          /
13

14                            **INTRODUCTION**

15       George J. Alvarez, an inmate at the Corcoran State Prison, filed this *pro se* action seeking

16 a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent has moved to dismiss the

17 petition as untimely.  Alvarez has not filed an opposition, although he had argued in his amended

18 petition that his failure to meet the statute of limitations deadline should be excused due to his

19 actual innocence.  For the reasons discussed below, the court dismisses the untimely petition.

20

21                            **BACKGROUND**

22       Following a jury trial in Monterey County Superior Court, Alvarez was convicted of

23 forcible rape, kidnapping to commit another crime, residential burglary, first degree robbery,

24 misdemeanor child molestation, and misdemeanor threats of violence.  The jury found true the

25 allegation that he was not eligible for parole, and that the circumstances under which he

26 committed the sex offenses mandated a life sentence.  On March 30, 2002, Alvarez was

27 sentenced to 31 years to life in prison.

28       He appealed.  The California Court of Appeal affirmed the judgment of conviction on

March 25, 2004.  The California Supreme Court denied his petition for review on June 9, 2004.

**United States District Court**
For the Northern District of California

1     More than five years later, Alvarez filed several habeas petitions in the state courts.  First,

2   he filed a habeas petition in Monterey County Superior Court on October 29, 2009; that petition

3   was denied on November 20, 2009.  Second, he filed a habeas petition in the California Supreme

4   Court on March 18, 2010; that petition was denied on October 13, 2010, with citations to *In re*

5   *Robbins*, 18 Cal. 4th 770, 780 (Cal. 1988), and *In re Clark*, 5 Cal. 4th 750 (Cal. 1993).  The

6   citations to *Robbins* and *Clark* indicate the court rejected the petition as untimely under state

7   law.  *See Walker v. Martin*, 131 S. Ct. 1120, 1124 (2011).

8     Alvarez then filed his first federal habeas petition, *Alvarez v. Lopez*, N. D. Cal. No. C 11-

9   373 SI.  After respondent moved to dismiss the petition, Alvarez moved to withdraw the

10  unexhausted petition so that he could pursue state court remedies.  The court granted Alvarez's

11  request and dismissed the action.

12    Alvarez then returned to state court to file three more collateral challenges to his

13  conviction.  Alvarez filed a petition for writ of mandate/prohibition in the California Court of

14  Appeal on February 15, 2012; that petition was denied on March 6, 2012.  Alvarez next filed a

15  petition for review of that decision in the California Supreme Court on March 22, 2012; that

16  petition was denied on May 9, 2012.  Alvarez then filed a habeas petition in the California

17  Supreme Court on July 9, 2012; that petition was denied on September 19, 2012.

18    Alvarez then filed this action.  The petition has a signature date of October 24, 2012,

19  came to the court in an envelope with no visible postmark, was stamped "received" at the

20  courthouse on October 29, 2012, and was stamped "filed" on November 1, 2012.  For purposes

21  of the present motion, the court assumes the petition was mailed on the day it was signed, despite

22  the absence of a proof of service.  Due to Alvarez's status as a prisoner proceeding *pro se*, he

23  receives the benefit of the prisoner mailbox rule, which deems most documents filed when they

24  are given to prison officials to mail to the court rather than the day the document reaches the

25  courthouse.  *See Stillman v. Lamarque*, 319 F.3d 1199, 1201 (9th Cir. 2003).  His federal petition

26  is deemed filed as of October 24, 2012.

27

28

**United States District Court**
For the Northern District of California

1

**DISCUSSION**

2  A.      Petitioner Missed The Habeas Statute Of Limitations Deadline

3          Petitions filed by prisoners challenging non-capital state convictions or sentences must

4  be filed within one year of the latest of the date on which:  (1) the judgment became final after

5  the conclusion of direct review or the time has passed for seeking direct review; (2) an

6  impediment to filing an application created by unconstitutional state action was removed, if such

7  action prevented petitioner from filing; (3) the constitutional right asserted was recognized by

8  the Supreme Court, if the right was newly recognized by the Supreme Court and made

9  retroactive to cases on collateral review; or (4) the factual predicate of the claim could have been

10  discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(A-D).

11          Here, the judgment became final and the limitations period started on September 7, 2004,

12  ninety days after the California Supreme Court denied the petition for review on June 9, 2004.

13  *See Bowen v. Roe*, 188 F.3d 1157, 1159 (9th Cir. 1999) (direct review period includes the period

14  during which the petitioner could have sought further direct review, regardless of whether he did

15  so).  The presumptive deadline for Alvarez to file his federal petition was September 7, 2005.

16          Alvarez urges that he should receive a delayed start to the limitations period for his newly

17  discovered evidence of a 2012 California Supreme Court case that shows his actual innocence.

18  *See* 28 U.S.C. § 2244(d)(1)(D) (one-year limitations period does not start until "the date on

19  which the factual predicate of the claim or claims presented could have been discovered through

20  the exercise of due diligence").  The "actual innocence" argument is discussed and rejected later

21  in this order.

22          The one-year limitations period may be tolled for the "time during which a properly filed

23  application for State post-conviction or other collateral review with respect to the pertinent

24  judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  Here, Alvarez did not file any state

25  habeas petition during the one-year limitations period ending on September 7, 2005.  His state

26  habeas petitions filed in 2009 and later did not toll the limitations period that had already

27  expired.  *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).  He therefore receives

28  no statutory tolling.

United States District Court
For the Northern District of California

1    The one-year limitations period can be equitably tolled because § 2244(d) is not

2 jurisdictional. *Holland v. Florida*, 560 U.S. 631, 645 (2010). "'A litigant seeking equitable

3 tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights

4 diligently, and (2) that some extraordinary circumstance stood in his way.'" *Id.* at 655 (quoting

5 *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  Alvarez makes no argument for any equitable

6 tolling, and none is apparent.  Equitable tolling is not warranted.

7

8    B.      Petitioner Does Not Pass Through The Actual Innocence Gateway

9    A federal court may hear the merits of successive, abusive, procedurally defaulted, or

10 untimely claims if the failure to hear the claims would constitute a miscarriage of justice.  The

11 Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show

12 that "a constitutional violation has probably resulted in the conviction of one who is actually

13 innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray v. Carrier*, 477 U.S. at 496).

14 Under this exception, a petitioner may establish a procedural "gateway" permitting review of

15 defaulted claims if he demonstrates "actual innocence." *Schlup*, 513 U.S. at 316 & n.32.  The

16 actual innocence gateway established in *Schlup* is available to a petitioner whose petition is

17 otherwise barred by AEDPA's statute of limitations. *See McQuiggin v. Perkins*, 133 S. Ct. 1924,

18 1928 (2013).  "[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot

19 have confidence in the outcome of the trial unless the court is also satisfied that the trial was free

20 of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway

21 and argue the merits of his underlying claim." *Schlup*, 513 U.S. at 316.  The required evidence

22 must create a colorable claim of actual innocence, that the petitioner is innocent of the charge

23 for which he is incarcerated, as opposed to legal innocence as a result of legal error. *Id.* at 321.

24    "One way a petitioner can demonstrate actual innocence is to show in light of subsequent

25 case law that he cannot, as a legal matter, have committed the alleged crime." *Vosgien v.*

26 *Persson*, No. 12-35397, slip op. at 7 (9th Cir. Feb. 13, 2014).  In *Vosgien*, the petitioner had been

27 convicted of several crimes in Oregon, including "compelling prostitution" based on his acts of

28 bribing his daughter to procure sexual favors for himself.  Several years later and in a different

4

United States District Court
For the Northern District of California

case, an Oregon appellate court interpreted the compelling prostitution statute to apply only to defendants who induced someone to engage in prostitution with third parties. *Id.* at 7-8. The parties in *Vosgien* agreed that the petitioner "cannot, as a legal matter, have committed the crime of compelling prostitution based on the facts under which he was convicted." *Id.* at 8. *Vosgien* held that the petitioner "has thus successfully demonstrated, in light of subsequent Oregon case law, actual innocence under *Schlup* as to the compelling prostitution convictions." *Id.* at 10. The untimeliness of his federal petition was excused because he now passed through the *Schlup* gateway. *See Vosgien*, slip op. at 10-11. *Vosgien* recognized a serious limit to the breadth of that gateway. "[A] demonstration of actual innocence under *Schlup* cannot excuse a petitioner's procedural default for more than the counts as to which he has shown actual innocence." *Vosgien*, slip op. at 10. In *Vosgien*, that meant that the petitioner who was now actually innocent of compelling prostitution could proceed with his claims challenging the conviction for compelling prostitution, but not the convictions in the same case for rape, sodomy, and sexual abuse.

Here, Alvarez argues that a new California Supreme Court decision shows he is actually innocent of kidnapping "Doe 1" for purposes of rape because his movement of her about 75 feet does not amount to kidnapping. Had the California Supreme Court issued a ruling that effectively decriminalized Alvarez's kidnapping-type conduct, *Vosgien* would require this court to excuse his otherwise time-barred claims challenging that kidnapping for rape conviction. The California Supreme Court did not issue such a ruling, however. The court now describes Alvarez's rape and the new-ish California Supreme Court decision, and then explains why the latter does not affect the conviction for the former.

### 1.    The Kidnapping Committed By Alvarez

The only crime as to which Alvarez claims actual innocence is the kidnapping for the purposes of rape of Doe 1, so only that crime is discussed here. The California Court of Appeal described the evidence at trial relating to that crime:

In May 2000, Doe 1 rented a room in her Salinas home to Shanal J. and Shanal's

**United States District Court**
For the Northern District of California

1    boyfriend. The boyfriend moved out that summer. In April 2001, Shanal moved out, leaving behind a stereo and other items.

2

3    On May 4, 2001, . . . Doe 1 got into her car and was buckling up her four-year-old son when defendant approached and asked for Shanal. Doe 1, who had not met defendant before, noticed that he had a "very distinctive face." When she said Shanal had moved out a few weeks ago, defendant asked if she knew anything about Nuestra Familia. Doe 1 said she did not. Defendant then asked Doe 1 to get out of the car. He calmly said he wanted to discuss things that he did not want her son to hear. Doe 1 became scared when she saw what looked like the "butt" of a gun in defendant's waistband. Concerned her son might cry or upset defendant, she decided to get out of her car to speak with defendant.

4

5

6

7    Defendant said Shanal had been "doing some prostitution" for Nuestra Familia, that she had made money off their clients, and that she owed $500 which he had been "sent to collect." He told Doe 1 her house was being watched and that he knew she had a teenaged daughter who "was by herself a lot." Doe 1 told defendant he could have Shanal's pager number and the stereo Shanal had left. When defendant said they needed to go inside the house, Doe 1 sat in her porch chair and told defendant he "could go inside, take whatever he wanted." She was crying and "felt intimidated" as defendant insisted they both needed to go inside. Defendant is "fairly big," Doe 1 is 5'2", and defendant stayed "really close" to her as he "guided" her towards her front door. Doe kept saying she did not want to go inside. Her hands shook and she fumbled with her keys while defendant seemed "amused" by her obvious fear.

8

9

10

11

12

13    Defendant bolt locked the front door after they went inside. Doe 1 felt nauseated; she sat on a couch and put her head down. Defendant, who continued to be "amused" by Doe 1's discomfort, remained "calm" as he checked whether anyone else was present. He waved his gun, which was wrapped in a red rag, as he walked around the living room. Doe asked if he could "please put that away" because "I feel nauseous." Defendant put the gun away, and she did not recall seeing it again until later. Defendant next said they needed to go upstairs to look at Shanal's stereo. He guided Doe 1 upstairs, walking "directly behind" her. She showed him Shanal's room and then started back towards the stairs, but defendant touched her waist and turned her, guiding her towards her own bedroom.

14

15

16

17

18

19    Once they entered her room, defendant closed Doe 1's door and locked it. As she sat on the bed crying, defendant stood and told her to pull her pants and underwear down. He spoke in a soft, calm voice. Doe 1 kept saying she was not "like Shanal," but she complied because she was scared and intimidated by defendant's size and his gun. At some point, he placed the object wrapped in the rag on the bed.

20

21

22    Cal. Ct. App. Opinion (Resp. Ex. B) at 2-4. Alvarez then raped Doe 1.

23

24        2.    The *Brents* Decision

25        In *People v. Brents*, 53 Cal. 4th 599, 608-614 (Cal. 2012), the defendant contended that

26   there was insufficient evidence to support the kidnapping special circumstance finding that made

27   him eligible for the death penalty and that there was a related instructional error. The gruesome

28   facts in *Brents* were that the defendant tried to suffocate and choke the victim, then put her alive

**United States District Court**
For the Northern District of California

1    "in the trunk of a borrowed car, drove her to a remote location, opened the trunk, poured

2    gasoline on her, closed the trunk, poured gasoline on the outside of the trunk, and lit the gasoline

3    on fire.  [The victim] burned to death, trapped in the trunk." *Id.* at 601.  The defendant was

4    convicted of, among other things, first degree murder (Cal. Penal Code § 187(a)) and kidnapping

5    (*id.* at § 207(a)), and the jury found true the special circumstance that the defendant committed

6    the murder while engaged in a kidnapping offense (*id.* at § 190.2(a)(17)).[1]

7         The burned car with the victim in the trunk was found about 16 miles from where she had

8    been put in the trunk of that car, suggesting she had been driven about 16 miles.  *See Brents*, 53

9    Cal. 4th at 604.  (It is this physical distance that Alvarez seizes upon to make his actual

10   innocence argument.)  The law required that the kidnapping special circumstance "could not be

11   merely incidental to the murder, with the murder being the defendant's primary purpose,"

12   although the special circumstance could be found if "there was a concurrent purpose to commit

13   both the murder and one of the listed felonies." *Id.* at 608-09.  The question in *Brents* was

14   whether there was evidence from which the jury could infer an independent felonious purpose

15   to kidnap the victim.  *See id.* at 609.  The court found that there was evidence from which the

16   jury could infer an independent felonious purpose and discussed various theories that could

17   support such an inference.  First, the defendant could have killed the victim in the parking lot

18   where he first assaulted her, but instead "chose to take her for a drive–and not just a few miles,"

19   before which time he "had not mentioned to anyone an intent to burn [the victim] alive, and her

20   transgression would not seem to warrant so horrible a death.  A reasonable jury therefore could

21   infer that defendant was not sure what he wanted to do with [the victim] when he drove away

22   with her in the trunk.  He wanted to think about it, and going for a drive was his way of thinking

23   about it." *Id.* at 609-10.  Second, defendant may have planned initially to use the gasoline to

24   destroy evidence of the earlier assault and then later decided to use the gasoline to kill the victim.

25

26

27   [1]California Penal Code § 190.2(a) provides for a penalty of death or life without parole if one of the listed special circumstances has been found true.  One of those special circumstances is: "The murder was committed while the defendant was engaged in, or was an accomplice in, the commission

28   of, attempted commission of, or the immediate flight after committing, or attempting to commit, . . . Kidnapping."  Cal. Penal Code § 190.2(a)(17)(B).

*Id.* at 610.  Third, the defendant may have had a legally adequate concurrent objective to kill her but "wanted *first* to drive her around in a locked trunk, thoroughly terrifying her before she actually died."  *Id.* at 610 (emphasis in original).  By driving the victim around in the trunk for such a long distance, he must have known "he was increasing her terror," and if inflicting that terror was at least one of his purposes, he had a legally adequate concurrent purpose.  *Id.*  After setting out these scenarios, the court returned to the relevant inquiry, i.e., whether it would be irrational for a jury to conclude the defendant intended to kidnap the victim for some reason that was in addition to and independent of his intent to murder her.  "Although the evidence of such a goal is far from overwhelming, it is sufficient to support the jury's verdict."  *Id.* at 611.  The court refused to set aside the kidnapping special circumstance on the ground of insufficient evidence.  *See id.* at 611.

The California Supreme Court also addressed a claim of jury instruction error regarding the kidnapping special circumstance in *Brents*, and granted relief on that claim.  *See id.* at 611-614.  The instructional error claim concerned "the need to find an independent felonious purpose to kidnap [the victim]" to support the kidnapping special circumstance finding.  *Id.* at 611.  The instruction had erroneous wording that stated the wrong target crime.  The instructional error claim is largely irrelevant to the issues in the present case, except for one observation in *Brents*.  The court stated that the wording error in the instruction was in a portion that was critical to the case in which the evidence could support an inference that defendant's only purpose was to kill and that he lacked an independent purpose to kidnap.  The court stated: "Indeed, the evidence here of an independent purpose to kidnap was weak–although for the reasons previously stated [in the section about the sufficiency of the evidence], it was minimally sufficient."  *Id.* at 614.  (The phrase "minimally sufficient" is the second part of *Brents* that Alvarez seizes upon to make his actual innocence argument.)  *Brents* concluded that the kidnapping special circumstance finding had to be set aside due to the instructional error.  *Id.*

8

1              3.      Alvarez Is Not Actually Innocent of Kidnapping For Rape

2          If *Brents* had defined the crime of kidnapping in a way that meant that Alvarez's conduct

3    did not amount to kidnapping, his untimely federal habeas petition's challenge to the kidnapping

4    could pass through the *Schlup* actual innocence gateway. *See Vosgien*, slip op. at 7, 10. *Brents*

5    does not help Alvarez for the reasons explained below.  Even saying that comparing Alvarez's

6    case and *Brents* is like comparing apples and oranges suggests too close a kinship – it's more like

7    comparing apples and typewriters.

8          *Brents* did not address the crime of which Alvarez was convicted.  The kidnapping special

9    circumstance is not the same as the crime of kidnapping for rape.[2]  The former narrows the range

10   of first degree murderers who are eligible for the death penalty whereas the latter is a separate

11   and additional crime from the rape that is the purpose of the kidnapping.  The statutory language

12   is not even parallel.    *Compare* Cal. Penal Code § 190.2(a)(17)(B) (quoted in footnote 1)

13   *with* Cal. Penal Code § 209(b)(1) ("Any person who kidnaps or carries away any individual to

14   commit . . . rape . . . shall be punished by imprisonment in the state prison for life with the

15   possibility of parole").   Special circumstances and crimes are analytically different.  *See*

16   *generally Morales v. Woodford*, 388 F.3d 1159, 1173-74 (9th Cir. 2004) (distinguishing first

17   degree lying in wait murder and special circumstance lying in wait).  The *Brents* holding about

18   the kidnapping special circumstance does not transfer to the crime of aggravated kidnapping in

19   general.

20         Alvarez misreads *Brents* in his argument that the "California Supreme Court found 16

21   miles in the trunk of a car 'minimally sufficient' to support a finding of kidnapping." Docket #

22   4-1 at 3.  The *Brents* decision's use of the phrase "minimally sufficient" pertained to whether

23   there was sufficient evidence to support the jury's conclusion that the defendant intended to

24   kidnap the victim for some reason that was in addition to and independent of his intent to murder

25

26

27         [2]Kidnapping to commit rape is a type of aggravated kidnapping.  California Penal Code § 209
     and § 209.5 define the felonies of kidnapping for robbery, for extortion or ransom, for specified sex
28   offenses, or to facilitate a carjacking.  These are "sometimes called 'aggravated kidnappings.'"  B. E.
     Witkin and N. Epstein, 1 California Criminal Law -- Crimes Against The Person, § 292 at 1125 (4th ed.
     2012).

**United States District Court**
For the Northern District of California

9

**United States District Court**
For the Northern District of California

1   her. *See Brents*, 53 Cal. 4th at 611, 614.    Thus, even if *Brents* applied to the crime of

2   aggravated kidnapping (which it does not), the holding pertained to the defendant's mental state

3   rather than any movement requirement.  That the victim was moved 16 miles was relevant only

4   for the way it permitted inferences that would support the finding that the defendant had the

5   intent required for the special circumstance. *See id.* at 609-11. *Brent*s simply did not establish

6   a 16-mile minimum for the movement necessary for the special circumstance, let alone for the

7   crime of aggravated kidnapping.

8        California law regarding the movement necessary for the crime of kidnapping for rape

9   remains as stated in California Penal Code § 209(b)(2), which is a codification of the rule

10  expressed in *People v. Rayford*, 9 Cal. 4th 1 (Cal. 1994).  Under California law, it is not the

11  number of feet or miles the victim is moved, but instead whether the movement "is beyond that

12  merely incidental to the commission of, and increases the risk of harm to the victim over and

13  above that necessarily present" in the rape.  Cal. Penal Code § 209(b)(2); *Rayford*, 9 Cal. 4th at

14  22.   The analysis is qualitative and requires consideration of the "scope and nature of the

15  movement, as well as the context of the environment in which the movement occurred." *People*

16  *v. Dominguez*, 39 Cal. 4th 1141, 1151-52 (Cal. 2006) (citation and internal quotation marks

17  omitted).  Circumstances to consider include "whether the movement decreases the likelihood

18  of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or

19  enhances the attacker's opportunity to commit additional crimes." *Dominguez*, 39 Cal. 4th at

20  1152. *See, e.g., id.* 1151-52 (asportation element satisfied where the victim was moved about

21  25 feet from the shoulder of the road, down an embankment and partially into an orchard about

22  10-12 feet lower than the road's surface); *Rayford*, 9 Cal. 4th at 23 (asportation element satisfied

23  where the victim was "forcibly moved 105 feet at night from the parking lot of a closed store to

24  the other side of a wall located at the edge of the lot" where she was outside the view of passers-

25  by); *People v. Shadden*, 93 Cal. App. 4th 164, 170 (Cal. Ct. App. 2001) (asportation element

26  satisfied where victim was moved from front counter of store nine feet to a small back room

27  where she would be out of public view and "made it less likely for others to discover the crime

28  and decreased the odds of detection"); *People v. Aguilar*, 120 Cal. App. 4th 1044, 1049 (Cal. Ct.

1   App. 2004) (asportation element satisfied where victim was moved 133 feet down a sidewalk
2   at night from an illuminated area to a dark area, thereby making it harder to escape and providing
3   defendant with an enhanced opportunity to commit additional crimes). *Brents* did not disturb
4   the statutory definition or these holdings showing that more than a tape measure is needed to
5   evaluate the asportation element of the crime of kidnapping for rape.

6          Under California law, Alvarez comes nowhere close to showing he is actually innocent
7   of the crime of kidnapping for rape.  Alvarez states that he moved his victim 75 feet.  The
8   unchallenged facts are that he moved the victim from the driveway of the house to the porch,
9   then into her house, then up the stairs, and then into her bedroom, and then raped her.  He moved
10  her away from her young son who was with her in the car, and he locked the front door to the
11  house after they entered the house, and locked the bedroom door after they entered the bedroom.
12  By moving her from an open area into the house and upstairs to her room and locking doors
13  behind them, Alvarez decreased the likelihood of detection, increased the danger inherent in Doe
14  1's foreseeable attempts to escape, and enhanced Alvarez's opportunity to commit additional
15  crimes. *See Dominguez*, 39 Cal. 4th at 1152.  He is not actually innocent of kidnapping for rape.
16  Alvarez therefore does not pass through the *Schlup* gateway to enable habeas review of
17  otherwise untimely claims challenging the kidnapping for rape conviction.  Alvarez also is not
18  entitled to a delayed start to the limitations period under 28 U.S.C. § 2244(d)(1)(D) because
19  *Brents* does not provide a "factual predicate" for any claim: the law regarding asportation was
20  and remains that stated in California Penal Code § 209(b)(2).

21

22  C.    Summary
23         The limitations period began on September 7, 2004 and was not statutorily or equitably
24  tolled.  The limitations period expired on September 7, 2005. Alvarez does not pass through the
25  actual-innocence gateway or have a delayed start of the limitations period based on the *Brents*
26  case.  His federal petition filed on October 24, 2012 is time-barred.
27         A certificate of appealability will not issue because this is not a case in which "jurists of
28  reason would find it debatable whether the petition states a valid claim of the denial of a

11

1  constitutional right and that jurists of reason would find it debatable whether the district court

2  was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

3

4                                            **CONCLUSION**

5        Respondent's motion to dismiss is GRANTED.  (Docket # 10.)  The petition for writ of

6  habeas corpus is dismissed because it was not filed before the expiration of the limitations period

7  in 28 U.S.C. § 2244(d)(1).  The clerk will close the file.

8        IT IS SO ORDERED.

9  DATED: March 12, 2014                        _____

                                                SUSAN ILLSTON
10                                               United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

                                            12